Joseph and Roxanne DARLING, Plaintiffs,

v.

WESTERN THRIFT & LOAN, Defendant.

No. CV–06–123–B–W.

United States District Court, D. Maine.

Feb. 20, 2009.

David J. Van Dyke, Hornblower, Lynch, Rabasco & Van Dyke, Lewiston, ME, for Plaintiffs.

Ali Parvaneh, Robert Sabahat, Madison Harbor, ALC, Irvine, CA, Steven J. Mogul, Gross, Minsky & Mogul, P.A., Bangor, ME, for Defendant.

## ORDER AFFIRMING RECOMMENDED DECISION ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

JOHN A. WOODCOCK, JR., Chief Judge.

Homeowners Roxanne and Joseph Darling claim their mortgage broker, Western Thrift & Loan (Western), defrauded them and violated state and federal consumer protection regimes when its agent induced them to refinance their home with an adjustable rate mortgage that is becoming more expensive by the day. Before the Court is Western's motion for summary

judgment, which the Magistrate Judge has recommended be granted in part and denied in part. Because the Court agrees with the Magistrate Judge that (1) Western should be granted judgment on the sole federal cause of action, (2) it is appropriate that the Court exercise supplemental jurisdiction over the remaining state law claims, and (3) there exist genuine issues of material fact with respect to each element of all remaining claims, the Court affirms the recommendations of the Magistrate Judge.

## I. STATEMENT OF FACTS

With significant expenditures planned, the Darlings refinanced their $190,000 mortgage by borrowing $266,250 in 2005, leaving them roughly $75,000 in cash. They thought they had borrowed on the cheap: one percent for one year, and yearly increases of only one-tenth of one percent, at most, each year thereafter. It turns out the terms of the new loan are dramatically different. The interest rate increased far more rapidly than expected, and the principal amount has grown, or negatively amortized, because they have been paying only a portion of the interest due. Crying foul, the Darlings filed suit against their lender, IndyMac Bank; their individual mortgage broker, Paul Mikhail; and his employer, Western.

After voluntarily moving to dismiss IndyMac and Mr. Mikhail, the Darlings filed a Second Amended Complaint naming Western as the sole defendant. *Second Am. Compl. for Actual and Punitive Damages, Inj. Relief and for Decl. J. on Rescission under TILA, Violations of Maine's Unfair and Deceptive Practices Act, Negligent Misrepresentation, Breach of Fiduciary Duty and Malice* (Docket # 32) (*Second Am. Compl.*). Western moved for summary judgment. *Def. Western Thrift & Loan's Mot. for Summ. J. or, in the Alternative, Mot. for Partial Summ. J./Summ. Adjudication* (Docket # 45)

(*Def.'s Summ. J. Mot.*); *Def. Western Thrift & Loan's Supporting Statement of Material Facts in Supp. of its Mot. for Summ. J. or Alternatively Partial Summ. J./Summ. Adjudication* (Docket # 46) (*Western's SMF*). The Darlings responded and Western replied. *Pls.' Opp'n to Def. Western Thrift & Loan's Mot. for Summ. J.* (Docket # 51); *Pls.' Counter–Statement of Material Facts in Dispute in Supp. of their Opp'n to Def. Western Thrift & Loan's Mot. for Summ. J.* (Docket # 52) (*Darlings' SMF*); *Def. Western Thrift & Loan's Reply to Pls.' Opp'n to Mot. for Summ. J., or in the Alternative, Mot. for Partial Summ. J./Summ. Adjudication* (Docket # 59); *Def. Western Thrift & Loan's Reply Statement of Material Facts in Supp. of its Reply to Pls.' Opp'n to Mot. for Summ. J., or in the Alternative, Mot. for Partial Summ. J./Summ. Adjudication* (Docket # 60) (*Western's RSMF*). The Magistrate Judge filed with the Court her recommended decision on Western's motion on August 12, 2008. *Recommended Decision* (Docket # 61) (*Rec. Dec.*). Western filed its objections and the Darlings filed their response thereto on August 22 and 26, respectively. *Objection to Magistrate's Recommended Decision and Request for De Novo Review and Oral Argument* (Docket # 62) (*Def.'s Obj.*); *Pl.'s Opp'n to Def.'s Objection to the Magistrate Judge's Recommended Decision Respecting the Def.'s Mot. for Summ. J.* (Docket # 63) (Pls.' Resp.).

## II. THE RECOMMENDED DECISION

Following a comprehensive recitation of the facts, the Magistrate Judge addressed each of the Darlings' six claims, beginning with the only one arising under federal law.

### A. Summary Judgment on the Truth in Lending Act Claim

Plaintiffs allege that Western violated the Truth in Lending Act (TILA), 15

U.S.C. § 1601 *et seq.*, by failing to disclose information material to the loan transaction. The Magistrate Judge concluded TILA's one-year statute of limitation bars this claim. *Rec. Dec.* at 215 (citing 15 U.S.C. § 1640(e)). The Darlings do not object to this conclusion. *See Pls.' Resp.* at 2. Because the Court agrees that the claim is time-barred, and the Plaintiffs do not object, the Court grants Western summary judgment on the TILA claim.

### B. Supplemental Jurisdiction under 28 U.S.C. § 1367

█ Granting summary judgment on the only claim arising under federal law requires that the Court decide whether to exercise jurisdiction over the remaining state law claims. The statute conferring supplemental jurisdiction on the district courts states, in part:

(a) Except as provided in subsections (b) and (c) or as expressly provided otherwise by Federal statute, in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

28 U.S.C. § 1367(a). The First Circuit has observed that "state and federal claims form part of the same constitutional case if they 'derive from a common nucleus of operative fact' or 'are such that ... would ordinarily be expected to [be] tried ... in one judicial proceeding.'" *Penobscot Indian Nation v. Key Bank of Me.*, 112 F.3d 538, 563–64 (1st Cir.1997) (alterations in original) (quoting *United Mine Workers v. Gibbs*, 383 U.S. 715, 725, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966)). The Court is satisfied that the state law tort claims and the time-barred TILA claim derive from a common nucleus of operative fact—the IndyMac loan transaction—and that exercise of sup-

plemental jurisdiction is proper, notwithstanding dismissal of the only claim over which the Court had original jurisdiction. *See* 28 U.S.C. § 1367(c); *Cao v. Puerto Rico*, 525 F.3d 112, 116 (1st Cir.2008). Furthermore, the Magistrate recommended that the Court exercise continuing jurisdiction over the Darlings' state law claims, and neither party objected to this recommendation. The Court will continue to exercise supplemental jurisdiction over the state law claims.

### C. The State Law Claims and Western's Objections

Western filed six objections in its request for *de novo* review of the recommended decision. Its first, a general objection that the Magistrate Judge failed to cite adequately the summary judgment record, is directed to the Magistrate Judge's recommendations on all the Darlings' remaining claims. *Def.'s Obj.* at 3. The Court does not address the general objection independently. Instead, the Court considers it throughout this Order, viewing the supported facts in the light most favorable to the Darlings, the non-movants, and giving them the benefit of all reasonable inferences. *See Cordi–Allen v. Conlon*, 494 F.3d 245, 248 (1st Cir.2007); *Robinson v. Wright*, 460 F.Supp.2d 178, 182 (D.Me.2006). For the sake of clarity, the Court discusses Western's objections not in the sequence Western presents them, but in the sequence the Magistrate Judge analyzed the Darlings' underlying claims.

#### 1. Objections to Recommended Decision on Fourth Cause of Action for Fraud

█ In Western's motion for summary judgment, it contended the Darlings' allegations of fraud are insufficiently particular and run afoul of Federal Rule of Civil Procedure 9(b). *Def.'s Summ. J. Mot.* at 18; Fed.R.Civ.P. 9(b). In its objection to the recommended decision, Western reit-

erates this contention and notes that the Magistrate Judge failed to address it.

■ Where, as here, "state law governs the burden of proving fraud at trial, the procedure for pleading fraud in federal courts in all diversity suits is governed by the special pleading requirements of Federal Rule of Civil Procedure 9(b)." *Hayduk v. Lanna,* 775 F.2d 441, 443 (1st Cir. 1985); *Siegemund v. Shapland,* 247 F.Supp.2d 1, 7 (D.Me.2003). Rule 9(b) requires that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed.R.Civ.P. 9(b). In other words, Rule 9(b) requires a fraud plaintiff to specify "the time, place, and content of an alleged false representation." *Greebel v. FTP Software, Inc.,* 194 F.3d 185, 193 (1st Cir.1999) (internal quotation omitted). The First Circuit has articulated Rule 9(b)'s three purposes: "(1) to place the defendants on notice and enable them to prepare meaningful responses; (2) to preclude the use of a groundless fraud claim as a pretext to discovering a wrong or as a 'strike suit'; and (3) to safeguard defendants from frivolous charges which might damage their reputations." *New Eng. Data Servs., Inc. v. Becher,* 829 F.2d 286, 289 (1st Cir.1987).

Western states that the Darlings "do not allege which terms of the loan transaction were allegedly misrepresented, and therefore Western and Mikhail are left to guess which terms were allegedly misrepresented." *Def.'s Obj.* at 7. However, the Darlings allege that Mr. Mikhail misrepresented, among other things, the impact of the variable interest rate on their loan and the facts surrounding Western's compensation. *Second Am. Compl.* ¶¶ 13–15, 47. This is minimally sufficient for Rule 9(b) purposes. What is more, Western's arguments belie its position. Western vigorously disputes each specific alleged false representation the Darlings attribute to it and Mr. Mikhail. Western says that Mr. Mikhail never misrepresented the possible effects of a variable interest rate. *Def.'s Obj.* at 7–8. Elsewhere, Western disputes the Darlings' allegations regarding its compensation. *Id.* at 4. The Court overrules Western's objection because it is apparent that Western had adequate notice of the Darlings' non-frivolous fraud allegations and has prepared meaningful responses.[1]

■ Western's next objection on the fraud claim strikes at the heart of the controversy and substantially overlaps its other objections. Western argues that Mr. Mikhail never made a false representation of a material fact to the Darlings; and, even if the record supports a finding that he did, the Darlings either did not rely on it or were not justified in doing so.[2] *Def.'s Obj.* at 7–8.

---

1. Western did not raise the Rule 9(b) argument in its answers to either of the Darlings' amended complaints. *See Answer of Def. Western Thrift & Loan to First Am. Compl.* (Docket # 7); *Answer of Def. Western Thrift & Loan to Second Am. Compl.* (Docket # 34).

2. Western also argues, both in its reply statement of facts and in its objection, that the parol evidence rule bars the introduction of any evidence of Mr. Mikhail's alleged misrepresentations. The Court agrees with the Magistrate Judge that this argument is without merit. *See Rec. Dec.* at 218. As the Law Court has often clarified, "[a]signed agreement that contradicts prior oral statements does not bar an action for fraud as a matter of law. Parol evidence of fraudulent inducement may be introduced to show that a signed document does not reflect the intent of the parties." *Ferrell v. Cox,* 617 A.2d 1003, 1006 (Me.1992); *Harriman v. Maddocks,* 518 A.2d 1027, 1029 (Me.1986) ("Any person may introduce parol evidence 'to evidence the fact [of] a false and fraudulent representation made for the purpose of inducing [that person] to execute [a contract].' " (alterations original) (quoting *Nelson v. Leo's Auto Sales, Inc.,* 158 Me. 368, 370, 185 A.2d 121, 122 (1962))).

To sustain a fraud claim, a party must show: (1) that the other party made a false representation (2) of a material fact (3) with knowledge of its falsity or in reckless disregard of whether it is true or false (4) for the purpose of inducing him to act in reliance upon it, and (5) he justifiably relied upon the representation as true and acted upon it to his damage.

*Guiggey v. Bombardier*, 615 A.2d 1169, 1173 (Me.1992). The Magistrate Judge determined that "[t]he record presents a genuine question whether [Mr. Mikhail] supplied the Darlings with information he knew to be false concerning the terms of the loan he secured for the Darlings, for the purpose of inducing their reliance, which resulted in economic harm when the terms were not as good as represented." *Rec. Dec.* at 216. The Magistrate Judge's determination is correct. *See Napier v. F/V Deesie, Inc.*, 454 F.3d 61, 66 (1st Cir. 2006) (explaining that a movant for summary judgment bears the burden to "demonstrate that there is 'an absence of evidence to support the nonmoving party's case'" (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986))).

The Court treats separately Western's supporting record citations that address (1) whether Mr. Mikhail made representations of material fact, and the content of those representations; and (2) whether the Darlings justifiably relied on them to their detriment. Western states that the Darlings "admitted that Mikhail *never* represented to [them] that the interest rate of their loan would not change in the first year of the loan, only that the amount of [their] *payment* would not change during the first year." *Def.'s Obj.* at 8 (citing *Western's SMF* ¶ 50; *Darlings' SMF* ¶ 50 (Admit)). Although the Court strains to interpret as the parties do Mrs. Darling's deposition testimony on this point, the Court will not disturb the Darlings' admission.[3] The Court need not. Citing other excerpts of Mrs. Darling's deposition, the Darlings state that during a call they made to Mr. Mikhail during the loan closing, "Mr. Mikhail confirmed that the paperwork detailed a one percent loan[4] as he had described it throughout the prior months." *Darlings' SMF* ¶ 99 (citing *R.*

---

**3.** Q: Mr. Mikhail told you the amount of your payment would not change for the first year, correct?

A: Right.
Q: He did not tell you that the interest rate would not change in the first year, only that the amount would not change in the first year, correct?
A: No.

*R. Darling Dep.* 195:3–195:9. It is difficult to know what to make of this inartful question and ambiguous answer. The question contains three negatives, ends with a positive, and is answered by a negative. The answer could be—no, you are correct; he did not tell me—or no, you are not correct; he did tell me. But, since the Darlings have admitted Western's fiftieth statement of material fact, there is no need to go any further.

**4.** In its reply statement of material facts, Western lodges multiple objections on vague-

ness grounds to the phrase "one percent loan," a phrase the Darlings use to refer to the loan they believed they were acquiring. As is evident from the excerpt from the deposition of Mr. Mikhail cited *infra* note 5, the phrase "one percent loan" itself is not unfamiliar to the parties in this case. However, they have significantly different conceptions of the terms of that "one percent loan." For the purposes of this Order unless the context indicates otherwise, the terms of a "one percent loan" are those that the Darlings understood Mr. Mikhail was offering, which were, at a minimum, a fixed interest rate of one percent for the first year, and a variable rate thereafter that would never increase by more than one tenth of a percent per year. The germ of the Darlings' understanding of these terms is the March 3, 2005 Truth in Lending Act Disclosure Notice. *Darlings' SMF* ¶ 79; *March 3, 2005 Truth in Lending Act Disclosure Notice* (Docket # 56–5).

*Darling Dep.* 140:6–140:13; 140:21–142:3; 192:3–193:22). The record citations are in full support:

Q: Did you discuss with Mr. Mikhail the specific language in the Adjustable Rate Rider about the interest rate change dates?

A: I did.

Q: And he told you you could just disregard that?

A: He didn't say disregard, no. He said: You need to remember what I have told you. This one percent is going to be good for one year.

*R. Darling Dep.* 141:11–141:18.

Q: And just again, how was Mr. Mikhail able to satisfy yourself to proceed notwithstanding the apparent inconsistencies?

A: Just telling me that I don't understand how the loan process works. He said: You don't understand all these documents. I do. I've explained everything, how it all goes. You need to trust me. You need to just do what I said and trust me. When your first bill comes in, you're going to see everything has worked out fine.

Q: Did Mr. Mikhail confirm for you that you had a loan that would be one percent for one year?

A: Yes. Yes.

Q: Did Mr. Mikhail confirm for you that although after the first year the rate could change, and his experience was it has not gone up more than a 10th of a percent a year?

A: Yes.

*Id.* at 193:5–193:22. Even if the Darlings' statements might not be wholly consistent, there exists a genuine issue of material fact with respect to whether Mr. Mikhail told the Darlings that their loan would remain at one percent for the first year and whether he knew this was not true.[5] Further, it is reasonable to infer that Mr. Mikhail made these representations to the Darlings for the purpose of inducing their reliance. *See Caban Hernandez v. Philip Morris USA, Inc.,* 486 F.3d 1, 8 (1st Cir. 2007) (instructing that reasonable inferences must be drawn in the light most favorable to the non-movant).

Although Western does not press its objection on the issue of justifiable reliance in the context of the fraud claim, it is sensible to consolidate the reliance arguments and discuss them here. The Magistrate Judge candidly described the justifiable reliance question as "very troublesome." *Rec. Dec.* at 217. Reasoning that justifiable reliance presents an issue of fact, and that the parties presented facts suggesting the Darlings executed loan documents (which a jury could find were clear and not false) based on their understandings from Mr. Mikhail's alleged representations (which a jury could find were opaque and false), the Magistrate Judge recommended the Court allow a jury to resolve the question. *Id.* at 217–18 (citing *Devine v. Roche Biomedical Labs., Inc.,* 637 A.2d 441, 446 (Me.1994)). Western's principal argument is that the Magistrate's recommendation cannot stand in the light cast by the Darlings' admissions that the actual terms of the loan were disclosed by the loan documents, which the Darlings read and understood at the time they executed them. *Def.'s Obj.* at 3–4. The Court interprets this argument to mean both that the Darlings did not rely on Mr. Mikhail's repre-

---

5. "Mikhail discussed with Plaintiffs an option ARM with a start rate of one percent, in which Plaintiffs had expressed an interest. Moreover, the option ARM loan described to Plaintiffs would stay at one percent for one month." *Western's SMF* ¶ 47 (citing *P. Mikhail Dep.* 65:9–65:11 ("Q: Okay. How long was the 1[one] percent loan that you described to the Darlings going to stay at 1[one] percent? A: It's just the first month.")).

sentations, and, if they did, they were not justified in doing so because they knew his representations were false.

The record does not readily permit these conclusions. Mrs. Darling understood that she and her husband were obtaining an adjustable rate loan, and that the interest rate would not stay at one percent for the life of the loan. *Western's SMF* ¶ 24; *Darlings' SMF* ¶ 24 (Admit). Mrs. Darling also understood that when she signed the Adjustable Rate Rider on May 1, 2005, it indicated that the interest rate could change as early as July 1, 2005. *Western's SMF* ¶ 25; *Darlings' SMF* ¶ 25 (Admit); *see also Western's SMF* ¶ 34 (citing Adjustable Rate Rider, which provides for a maximum interest rate of 9.95%). However, even though Mrs. Darling testified that she understood at the deposition that the rate would adjust, and she understood what those adjustable rate provisions meant at the closing on May 12, 2005, it was not necessarily her understanding because it was not what she had been told. *Darlings' SMF* ¶ 26. As indicated above, Mrs. Darling said that Mr. Mikhail told her the interest rate would not increase during the first year and that increases thereafter would not exceed one-tenth of a percent per year. *See Darlings' SMF* ¶¶ 26, 99 (citing *R. Darling Dep.* 192:3–193:22). The record thus supports a finding that the Darlings may have had divergent understandings of the loan at the closing—one from Mr. Mikhail's alleged representations and one from the documents. The great extent to which these understandings diverged is apparent from the fact that the Darlings called Mr. Mikhail during the closing to ask him questions. *Darlings' SMF* ¶ 98; *Western's RSMF* ¶ 98 (Qualified). Finally, it is reasonable to infer that the Darlings relied on Mr. Mikhail's alleged representation that the loan documents—which the Darlings "did not understand," according to

Mr. Mikhail, *Darlings' SMF* ¶ 99—were faithful to the original deal.

To fend off summary judgment, the Darlings must demonstrate there is a genuine issue as to whether their reliance, detailed above, was justified. Under Maine law, a party " 'may justifiably rely on the fraudulent misrepresentation of [another] ... without investigating the truth or falsity of the representation. Reliance is unjustified only if the plaintiff knows the representation is false or its falsity is obvious to him.' " *St. Francis De Sales Fed. Credit Union v. Sun Ins. Co. of N.Y.*, 2002 ME 127, ¶ 29, 818 A.2d 995, 1003 (alterations in original) (quoting *Estate of Whitlock*, 615 A.2d 1173, 1176 (Me.1992)). Western argues against justifiable reliance from the proposition that the Darlings "cannot be defrauded as to contract terms they understood." *Def.'s Obj.* at 8. Mindful that there is a genuine issue as to the actual nature and extent of the Darlings' understanding, the Court takes Western's argument to be that when there exists a writing that clearly contradicts prior oral representations, a person can never be justified in relying on the oral rather than the written terms.

In *Ferrell v. Cox*, 617 A.2d 1003 (Me.1992), the Law Court addressed a very similar argument. Cox, then an active judge, contacted Ferrell, a lawyer and adjacent landowner, to inquire whether Ferrell would convey a utility easement to him so that he could run power and telephone lines across Ferrell's property to his cottage. *Ferrell*, 617 A.2d at 1004–05. Ferrell agreed to the conveyance in reliance on Cox's professed opposition to developing the peninsula on which they both lived, a sentiment Ferrell shared. *Id.* at 1005. Upon reading the deed that Cox drafted, Ferrell became concerned that the language described an unrestricted easement, and not one limited to utility lines

for Cox's cottage. *Id.* Cox assured Ferrell that the power company required the broad language and that it was standard practice. *Id.* In fact, Cox had been acquiring various property rights from landowners on the peninsula with the intention of transferring them to a developer, which he accomplished following the Ferrell conveyance. *Id.* After losing a motion for a directed verdict and being found liable on Ferrell's fraudulent misrepresentation claim, Cox argued on appeal that the signed writing precludes a finding of justifiable reliance. *Id.* at 1006. The Law Court not only stated the inapplicability of the parol evidence rule, *see supra* note 2, but also concluded

> the record establishes that Ferrell agreed to sign the deeds conveying an easement to Cox only after Cox told him the broader language had been included on the request of the utility company and reaffirmed his previously stated intention to use the easement only to reach his own property. Based on this evidence the jury rationally could have found that Ferrell did not know Cox's representations were false or that the falsity of Cox's representations was not obvious to him.

*Id.* at 1006–07. Here, allegedly Mr. Mikhail told the Darlings—who are neither mortgage brokers like he is, nor lawyers like Ferrell and Cox are—that they "did not understand loan paperwork" and that they were signing up for the one percent loan they had talked about for months. *Darlings' SMF* ¶ 99. Moreover, at that time the Darlings thought Mr. Mikhail worked for IndyMac. *Darlings' SMF* ¶ 103; *Western's RSMF* ¶ 103 (Qualified).[6] Proceeding under this confusion, and learning for the first time at closing that IndyMac was the lender, *Darlings' SMF* ¶ 101; *Western's RSMF* ¶ 101 (Qualified), the Darlings may have believed that Mr. Mikhail knew better than they the terms of the loan, and the interest rate adjustments IndyMac would apply in the future. Applying the obviousness standard to the record, viewed in the light most favorable to the Darlings, the Court determines that there is a genuine issue of material fact with respect to justifiable reliance. *See Robinson v. Wright*, 460 F.Supp.2d 178, 183–84 (D.Me.2006).

■■■ The final element of fraud is pecuniary damages.[7] *Jourdain v. Dineen*, 527 A.2d 1304, 1307 (Me.1987). The Magistrate Judge determined that the record presents a genuine issue whether the Darlings suffered economic harm when they accepted loan terms that were not as favorable as those Mr. Mikhail allegedly represented. *Rec. Dec.* at 216; *see Aff. of Roxanne Darling in Supp. of Pls.' Opp'n*

6. Western objects to this statement of fact on the grounds that it is irrelevant and lacks foundation pursuant to Federal Rules of Evidence 401 and 402. *Western's RSMF* ¶ 103 (Qualified). The Court overrules the objection. The fact is relevant because if true, it tends to make it more probable that the Darlings' reliance on Mr. Mikhail's representations was justified.

7. Maine law "draws a clear distinction between fraud that will vitiate a contract and fraud that is actionable as deceit." *Kuperman v. Eiras*, 586 A.2d 1260, 1262 (Me.1991) (internal quotation omitted). "It is not necessary that actual damage shall have resulted from fraud in order to justify rescission." *Id.* (internal quotation omitted). Because the record is unsettled with respect to whether the Darlings seek rescission and whether it is available, the Court does not decide at this stage of the case whether the Darlings may eventually be relieved of proving pecuniary damages. *Compare Second Am. Compl.* at 11–12 (praying for an order that Western assume the Darlings' obligations to IndyMac, and for actual, statutory, restitutional, and punitive damages), *with Western's SMF* ¶ 14 ("Plaintiffs wish to rescind the entire loan transaction, to keep their property and $75,000 free and clear, with no obligation whatsoever."), *and Darlings' SMF* ¶ 14 (Admit).

to Def. Western Thrift & Loan's Mot. for Summ. J. ¶ 23 (Docket # 55). Western objects to this damages determination only by citing the Darlings admission that "they could not have done a regular refinance in 2005 for the amount of money they borrowed from IndyMac Bank." Def.'s Obj. at 8 (citing Western's SMF ¶ 8; Darlings' SMF ¶ 8 (Admit)). The Court interprets Western's syllogism to be as follows: (1) homeowners suffer no damages when they knowingly reduce to cash some portion of their home equity; (2) the only way the Darlings could have reduced to cash some portion of their home equity was by refinancing their existing loan on the actual terms of the IndyMac loan; therefore (3) the Darlings were not harmed when they extracted $75,000 in cash from their home by refinancing their existing loan with IndyMac. Western's objections to the Magistrate Judge's recommendation as to the fraud claim are overruled.

## 2. Objections to Recommended Decision on Fifth Cause of Action for Negligent Misrepresentation

As the Magistrate Judge recognized and Western concedes, "[t]he fraud and negligent misrepresentation claims largely overlap." Rec. Dec. at 216; Def.'s Obj. at 9.

> One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable

care or competence in obtaining or communicating the information.

Rand v. Bath Iron Works Corp., 2003 ME 122, ¶ 13, 832 A.2d 771, 774 (quotation omitted). Like the Magistrate Judge, the Court has already found that there exist genuine issues of material fact that require denial of summary judgment on the fraud claim. Western's objections to the recommended decision on the negligent misrepresentation claim are overruled.[8]

## 3. Objections to Recommended Decision on Second Cause of Action for Violation of Maine's Unfair Trade Practices Act

In their second cause of action, the Darlings allege that Western violated Maine's Unfair Trade Practices Act (UTPA), 5 M.R.S.A. § 207. Second Am. Compl. ¶ 38. Specifically, the Darlings claim that Western and Mr. Mikhail violated UTPA in two principal ways: First, they received a Yield Spread Premium Fee (YSP) of $6,989.00 after telling the Darlings that the loan transaction did not involve any broker's fees, and failing to tell the Darlings how that fee affected the loan. Second, they willfully misled the Darlings about the terms of the loan, including the rate at which interest would accrue on the loan. Id. In its motion for summary judgment, Western disputed each claim.

### a. General Principles of UTPA Liability

The UTPA broadly proscribes "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." 5

---

8. Western devotes a portion of its objection to a discussion of circumstances under which liability may attach for failure to disclose material facts. The Court acknowledges that there are Maine cases that explain these circumstances, and considers them in the context of the fiduciary duty claim. However, because the Darlings have not alleged a failure to disclose in their negligent misrepresentation claim, cases that discuss active concealment and affirmative duty to disclose are not germane. See Def.'s Obj. at 9–10.

M.R.S.A. § 207. The Law Court has instructed that "[t]o justify a finding of unfairness, the act or practice: (1) must cause, or be likely to cause, substantial injury to consumers; (2) that is not reasonably avoidable by consumers; and (3) that is not outweighed by any countervailing benefits to consumers or competition." *State v. Weinschenk*, 2005 ME 28, ¶ 16, 868 A.2d 200, 206. Further, liability may attach under UTPA for deceptive acts:

> An act or practice is deceptive if it is a material representation, omission, act or practice that is likely to mislead consumers acting reasonably under the circumstances. A material representation, omission, act or practice involves information that is important to consumers and, hence, likely to affect their choice of, or conduct regarding, a product. An act or practice may be deceptive, within the meaning of Maine's UTPA, regardless of a defendant's good faith or lack of intent to deceive.

*Id.* ¶ 17, 868 A.2d at 206 (internal citations and quotations omitted). Importantly, "[t]he definitions of 'unfair' and 'deceptive' are questions of fact, and whether a particular act or practice is 'unfair' or 'deceptive' is determined on a case-by-case basis." *MacCormack v. Brower*, 2008 ME 86, ¶ 5, 948 A.2d 1259, 1261 (citations omitted).

### b. UTPA Violation by Misrepresenting the Terms of the Loan

In the Magistrate Judge's view, a determination that genuine issues of fact exist with respect to the Darlings' fraud and negligent misrepresentation claims is a sufficient basis on which to deny summary judgment on the UTPA claim. *Rec. Dec.* at 216. The recommended decision states that "[t]he provision of false information about the terms of a loan is likely to be regarded by a fact finder as material and likely to mislead consumers to their financial detriment." *Id.* The Court agrees, and by reference incorporates here its analysis of the Darling's fraudulent and negligent misrepresentation claims. Although denial of summary judgment on the UTPA claim is appropriate on this basis alone, the parties have briefed the issue of the YSP disclosure, and the Court addresses that issue next.

### c. UTPA Violation by Failing to Disclose Broker Compensation

In response to the Darlings' allegations that Western received the YSP after saying it would not, Western states that Mr. Mikhail did not receive a YSP *directly* from the Darlings; and, in the event he or Western did receive such a fee, IndyMac disclosed this fact to the Darlings.[9] *Def.'s Summ. J. Mot.* at 10–11 (citing *Western's SMF* ¶¶ 18–21). The Darlings admit that they did not directly pay Mr. Mikhail any money with respect to the loan transaction, and that "[b]y its nature, broker compensation is not paid by the borrower." *Darlings' SMF* ¶¶ 18–19. However, the Darlings claim that they did not understand the way in which Western and Mr. Mikhail would be compensated. *Id.* ¶ 20 (citing *R. Darling Dep.* 69:17–70:1). At her deposition, Mrs. Darling stated that Mr. Mikhail told her "that there would be no fee whatsoever shown on our documents of him receiving any money," and that "there would be no fees, processing fees, brokers fees" on the documents. *R. Darling Dep.* 69:17–69:18, 69:25–70:1. Mrs. Darling also testified that Mr. Mikhail told her he was

---

9. Western also argues that it and Mr. Mikhail "were not required to make disclosures to Plaintiffs, as Western and Mikhail are not creditors under TILA." *Def.'s Summ. J. Mot.* at 10. Western has not offered, and the Court is not aware of, any authority for the proposition that so long as it is not subject to TILA's disclosure obligations, Western is free to engage in business practices in the District of Maine through its agents that may be unfair or deceptive under state law.

paid through Pinnacle Quest, a third-party.[10]

In any event, Western did receive the YSP from IndyMac in connection with the Darlings' loan. *Western's SMF* ¶ 62; *Darlings' SMF* ¶ 62 (Admit). The issue is whether the Darlings were aware that Western would receive the YSP from IndyMac, where IndyMac would get the money to pay Western, and, if the Darlings were not aware of these facts, whether their unawareness is material under the UTPA. Western cites the deposition of Molly Graham, IndyMac's Rule 30(b)(6) designee, who, upon reviewing the Darlings' file in Pasadena, California, testified that the Darling file contained a document entitled "Lender's Closing Instructions," which disclosed the YSP. *Western's SMF* ¶ 20. Western also cites the "Lender's Closing Instructions" document, which was marked at the deposition of Roxanne Darling. *Id.* However, Molly Graham was not at the closing,[11] the "Lender's Closing Instructions" does not disclose the source of the YSP funds, and Roxanne Darling's confusion with regard to the YSP is evident from her deposition. Finally, in its statement of facts, Western states that "[b]rokers' fees were disclosed to Plaintiffs; Joseph Darling recalled that the loan paperwork did disclose some type of broker compensation." *Western's SMF* ¶ 21 (citing *J. Darling Dep.* 8:14–8:17); *Darlings' SMF* ¶ 21 (Qualify). It is true that Joseph Darling testified that he had seen certain loan paperwork that mentioned some type of broker compensation. It is apparent from the context of his testimony, however, that he was talking about a fixed-rate loan he had undertaken with his ex-wife Lori to purchase a house in a different town. *See J. Darling Dep.* 5:19–8:17. On this record, the Court does not hesitate in finding there is a genuine factual issue regarding whether the Darlings knew Western would receive a YSP from IndyMac.

Even if the YSP was disclosed to the Darlings at or before the closing, there still exists a genuine issue whether the disclosure was full and accurate. Notwithstanding the Darlings' admissions that they did not directly pay Mr. Mikhail any money and that by its nature broker compensation is not paid by the borrower, the record indicates that Mr. Mikhail did not tell the Darlings where IndyMac got the money it ultimately paid to Western. On this point, Western cites the following exchange from Mr. Mikhail's deposition testimony:

Q: Did you ever tell the Darlings that you were not going to receive any money from them for your work on the—in obtaining this loan?

A: That I would receive no money from them?

Q: Correct.

A: Well, I don't receive any money from them. And I wouldn't have received any money from them.

*P. Mikhail Dep.* 116:7–116:13 (cited in *Western's SMF* ¶ 18). Western fails to cite the exchange immediately following:

Q: Well, the amount that you are paid is paid by the bank and its included in the amount financed; correct?

---

**10.** "Although neither party exactly spells this out in their statements of material facts, Pinnacle Quest appears to have been an entity that held seminars at exotic locations promising educational materials about the latest 'good investment opportunities' and other current topics." *Rec. Dec.* at 215 n. 3. One of the Darlings' main goals in refinancing their mortgage was to raise enough cash to join this organization. *Western's SMF* ¶ 2; *Darlings' SMF* ¶ 2 (Admit).

**11.** "No one was present at the closing other than Plaintiffs and a representative of Yankee Title." *Darlings' SMF* ¶ 94; *Western's RSMF* ¶ 94 (Admit).

A: Correct. There's a—you know, for every loan we do there is a percentage that is paid based on the rate or based on the loan or whatever the lender is paying out on that.

Q: You don't get a check directly from the borrower—

A: No.

Q:—but you get paid indirectly from the borrower? It's through the loan?

A: Yeah, I get paid through the loan from the broker.

Q: Do you ever explain that mechanism to the Darlings?

A: That mechanism of paying through the broker? No, I had never explained that to them.

*P. Mikhail Dep.* 116:14–117:6; *but see Mortgage Loan Origination Agreement* (Docket # 50–2) ("The retail price we offer you—your interest rate, total points and fees—will include our compensation."). Assuming the YSP was disclosed to the Darlings, Mr. Mikhail's testimony, when combined with the Mortgage Loan Origination Agreement, is evidence that the economic substance of the YSP may not have been explained to and understood by the Darlings.

■ The Court is satisfied that a genuine issue of fact exists with regard to whether the Darlings were misinformed about the existence or nature of the YSP. Further, the Court is satisfied that this misinformation, if true, is material in both required respects: First, it is material under the substantive law—it involves information that is likely to affect consumer choice. *Weinschenk*, 2005 ME 28, ¶ 17, 868 A.2d at 206. Second, it is material under the procedural law—"it has the potential of determining the outcome of the litigation." *Maymi v. P.R. Ports Auth.*, 515 F.3d 20, 25 (1st Cir.2008). An act or practice is deceptive under UTPA if it is a "material representation, omission, act or practice that is likely to mislead consumers

acting reasonably under the circumstances." *Weinschenk*, 2005 ME 28, ¶ 17, 868 A.2d at 206. Mr. Mikhail allegedly represented to the Darlings that they would not be paying him for his services, a representation which, because it depends on the illusory difference between direct and indirect broker compensation, will likely mislead a consumer acting reasonably under the circumstances. Accordingly, the record presents a genuine factual question of whether Mr. Mikhail's practice with respect to the YSP was deceptive.

### 4. Objections to Recommended Decision on Third Cause of Action for Breach of Fiduciary Duty

■ The Darlings claim that Western and Mr. Mikhail were their fiduciaries, and breached their corresponding duties by accepting the YSP after failing to disclose it, failing to ensure that the Darlings received clear and conspicuous notice of the terms of their loan, and inducing the Darlings into "a transaction that was contrary to their interests and needs." *Second Am. Compl.* ¶¶ 41–42. Western made several arguments in support of its motion for summary judgment on this claim. Western argued that the fact that the Darlings were free to leave the loan closing without signing any documents, *Western's SMF* ¶ 45; *Darlings' SMF* ¶ 45 (Admit), belies the Darlings' claim that there existed "a great disparity of position and influence" between the parties, which is required under Maine law. *Def.'s Summ. J. Mot.* at 16–17 (citing *Diversified Foods, Inc. v. First Nat'l Bank*, 605 A.2d 609, 614 (Me. 1992)). Western also contended that Joseph Darling's self-proclaimed familiarity with adjustable rate mortgages, refinancing transactions, interest rates, and the stock market precludes a finding that Western and Mr. Mikhail were the Darlings' fiduciaries. *Id.* at 17 (citing *Western's SMF* ¶¶ 67–69); *but see Darlings'*

*SMF* ¶¶ 67–68 (Qualify). Finally, borrowing from the vocabulary of negligence law, Western claimed that the fiduciary duty claim must fail because there is no evidence of causation between the alleged breach and any damages the Darlings may have suffered: "Plaintiffs understood the loan terms and the Yield Spread Premium was disclosed in the loan terms documents. Without reliance, there can be no causation." *Id.*

The Magistrate Judge determined that the record generates a genuine issue as to whether there existed a fiduciary relationship between the Darlings and Mr. Mikhail:

> The Darlings relied on the broker, expressed doubt in continuing when they saw the terms of the loan he delivered, but placed their trust in his reassurances that they simply did not understand loan paperwork as he did, based on his superior knowledge of the same. This placement of trust, allegedly based on the broker's reassurances and promises, generates the potential factual finding needed to support the imposition of a fiduciary duty as a matter of law.

*Rec. Dec.* at 217. Western objects to this determination on several grounds, none of which is sufficiently compelling to merit rejection of the Magistrate Judge's recommendation. Western first points to its supplemental statement of fact, which the Darlings failed to controvert. *See Def. Western Thrift & Loan's Supplemental Supporting Statement of Material Facts in Supp. of its Mot. for Summ. J. or Alternatively Partial Summ. J./Summ. Adjudication* ¶ 73 (Docket # 49) (Western's Suppl. SMF). Citing the Mortgage Loan Origination Agreement, which purports to define the nature of the Darlings' and Western's relationship, Western states that it and Mr. Mikhail "were not subject to Plaintiffs' control and were not Plaintiffs' agents at any time during the loan

transaction." *Western's Suppl. SMF* ¶ 73; *see Mortgage Loan Origination Agreement* (Docket # 50–2). Western reasons that because properly stated facts are admitted if uncontroverted, *see* D. Me. Loc. R. 56(f), and the Darlings failed to controvert this supplemental statement of fact, the Darlings admit that there existed no agency relationship and their fiduciary duty claim therefore does not survive summary judgment.

The Court disagrees for several reasons. First, the Court need not credit "bald assertions" or "empty conclusions" at summary judgment. *Philip Morris*, 486 F.3d at 8. Whether Western and Mr. Mikhail were the Darlings' agents, and whether there existed between them a confidential or fiduciary relationship are questions of fact. *Clapperton v. U.S. Fidelity & Guar. Co.*, 148 Me. 257, 266, 92 A.2d 336, 341 (1952); *Ruebsamen v. Maddocks*, 340 A.2d 31, 35 (Me.1975); *cf. Fortin v. Roman Catholic Bishop of Portland*, 2005 ME 57, ¶ 35, 871 A.2d 1208, 1220 ("The question of whether one party owes a fiduciary or other duty of due care to another is a question of law."). Accordingly, even if the Darlings are held to this admission, the existence of other well-stated facts supports a finding of either an agency or fiduciary relationship that prevents summary judgment.

■ More importantly, the nonexistence of an agency relationship does not necessarily preclude a finding of a fiduciary relationship. To determine the extent of a principal's vicarious liability, the Law Court has held that a principal, though liable for the acts of an agent, is not liable for the acts of an independent contractor. *Bonk v. McPherson*, 605 A.2d 74, 78 (Me. 1992). The Law Court defined agency as " 'the fiduciary relationship which results from the manifestation of consent by one person to another that the other shall act

on his behalf and subject to his control, and consent by the other to so act.'" *Id.* (quoting *Restatement (Second) of Agency* § 1 (1958)). However, as Western recognizes, the Law Court defines a confidential or fiduciary relationship quite differently: "'[t]he salient elements of a confidential relation are the actual placing of trust and confidence in fact by one party in another and a great disparity of position and influence between the parties to the relation.'" *Camden Nat'l Bank v. Crest Constr., Inc.,* 2008 ME 113, ¶ 13, 952 A.2d 213, 217 (quoting *Ruebsamen,* 340 A.2d at 35). If a third party, harmed by a negligent act of Mr. Mikhail while he was securing a loan for the Darlings, were suing the Darlings on a theory of vicarious liability for the acts of their agent, the Mortgage Loan Origination Agreement and the issue of control and consent could be determinative. Instead, the Darlings are suing Western in tort for the acts of *its* agent, and proceed here under the theory that the existence of a fiduciary relationship may ease their burden of proving fraud. The parties' understandings recited in the Mortgage Loan Origination Agreement are inapposite.

▇▇▇ The Darlings' fiduciary duty claim is essentially an alternative theory of liability for Mr. Mikhail's failure to disclose material terms of the IndyMac loan. "When a plaintiff alleges a failure to disclose rising to the level of a misrepresentation, the plaintiff must prove either (1) active concealment of the truth, or (2) a specific relationship imposing on the defendant an affirmative duty to disclose." *Fitzgerald v. Gamester,* 658 A.2d 1065, 1069 (Me.1995). A plaintiff who succeeds in establishing an affirmative duty to disclose pursuant to a fiduciary relationship, however, still must prove a case similar to fraud:

> Substituting nondisclosure for false representation, a party with a fiduciary

duty to another commits fraud when he (1) intentionally does not disclose; (2) a material fact to the other; (3) for the purpose of inducing the other to act or refrain from acting in reliance on the failure to disclose; and (4) the other justifiably relies on the nondisclosure and acts upon it to his or her damage.

*Glynn v. Atl. Seaboard Corp.,* 1999 ME 53, ¶ 12, 728 A.2d 117, 120. Having analyzed the Darlings' allegations of Mr. Mikhail's nondisclosure and the other elements of fraud above, the Court need only address Western's complaint that the record does not support a finding of a fiduciary relationship.

Contrary to Western's assertions, the record allows for the inference that the Darlings actually placed trust and confidence in Mr. Mikhail, and that there was a great disparity of influence between them. On March 3, 2005, Mr. Mikhail conveyed to the Darlings a Truth in Lending Act Disclosure Notice (March 3, 2005 TILA) describing the one percent loan that he represented he was obtaining for them. *Darlings' SMF* ¶ 79; *March 3, 2005 Truth in Lending Act Disclosure Notice* (Docket # 56-5); *see supra* note 4. Mr. Mikhail told them, and they understood, that they could "rely" on the March 3, 2005 TILA, as the final loan would look "pretty much" like the one disclosed therein. *Darlings' SMF* ¶ 83. When the Darlings questioned the one percent loan as "too good to be true," Mr. Mikhail would "start from the beginning" and re-state all of his explanations and assurances that the loan would operate essentially as detailed in the March 3, 2005 TILA. *Id.* ¶ 87. When the Darlings hesitated to sign the Mortgage Loan Origination Agreement, which disclosed some form of broker compensation, Mr. Mikhail told them that the Agreement was "just a total legal document" and "just legal stuff," and they should simply sign it. *Id.* ¶ 91. Mrs. Darling recalled Mr. Mikhail's reactions to her concerns about the

Mortgage Loan Origination Agreement as follows:

> Q: So tell me why it is that you signed this if this is an agreement between you and Western Thrift that is different from the agreement you thought you had with Mr. Mikhail?
>
> A: Because every time I talked to Paul [Mikhail] about discrepancies in any of the documents, he constantly told me that this is all the procedure: Don't worry about it. You know what I've told you. You need to trust me. He goes: This is just a total legal document, he kept telling me. This is just legal stuff. Just go ahead and sign. Don't worry. You're not paying any broker fees.

*R. Darling Dep.* 134:22–135:8; *Darlings' SMF* ¶ 91. After she reviewed the actual loan documents and became concerned that Mr. Mikhail had not secured the one percent loan described in the March 3, 2005 TILA, Mrs. Darling called Mr. Mikhail for an explanation. *Darlings' SMF* ¶ 98. Mr. Mikhail confirmed that the paperwork detailed a one percent loan as he had described it throughout the prior months and as reflected in the March 3, 2005 TILA, and told the Darlings that they "did not understand loan paperwork"; this explanation satisfied the Darlings. *Id.* ¶ 99. Finally, speaking from years of experience in the industry, Mr. Mikhail repeatedly assured the Darlings that he had never seen the interest rate on a loan like theirs go up more than one-tenth of a percentage point per year. *Darlings' SMF* ¶¶ 26–27; *R. Darling Dep.* 36:1–38:24. Relying on this information, the Darlings signed the Adjustable Rate Rider, which provides for a maximum interest rate of 9.95%. *Darlings' SMF* ¶¶ 26–27; *R. Darling Dep.* at 36:1–38:24.

The Court agrees with the Magistrate Judge that it is reasonable to infer that the Darlings placed trust and confidence in Mr. Mikhail, and that this trust was in part a function of Mr. Mikhail's professed superior knowledge of mortgage transaction documents. *See Camden Nat'l Bank,* 2008 ME 113, ¶ 13, 952 A.2d at 217. Further, the facts Western offers to rebut the Magistrate Judge's recommendation cut against Western on this issue. Western maintains that the Darlings were under no obligation to sign the loan documents, and that they were free to rescind the loan for three days following the closing. Reasoning that the Darlings were free of its influence in both respects, Western states that it did not have any influence over the Darlings' actions, nor did there exist any great disparity of position between them. However, the reasonable inference is exactly the opposite: the reasonable inference is that had the Darlings kept their own counsel, they never would have signed the documents, and would have rescinded the loan during the three-day rescission period. *See Western's SMF* ¶ 11; *Darlings' SMF* ¶ 11 (Admit) ("In the four days following the loan closing, Plaintiff Roxanne Darling reviewed every page of the paperwork Plaintiffs brought back from the loan closing."). The only reasonable explanation for the Darling's execution of the documents and their failure to rescind the loan, therefore, is that Mr. Mikhail exerted overriding influence over their understanding of the loan terms and their decision-making. Because these facts generate a genuine issue as to whether a fiduciary relationship existed between the Darlings and Mr. Mikhail, and because genuine issues exist with respect to the remainder of the elements of the fraudulent nondisclosure claim, Western's objections to the recommended decision are overruled.

### 5. Objections to Recommended Decision on Sixth Cause of Action for Malice

The Magistrate Judge properly construed the Darlings' malice claim as a

plea for punitive damages. *Rec. Dec.* at 218. As such, it is not an independent basis for liability. *See Rand v. Bath Iron Works Corp.*, 2003 ME 122, ¶ 15, 832 A.2d 771, 775 ("[P]unitive damages may only be awarded in situations when the fact-finder has also awarded compensatory damages."). The Court agrees with the Magistrate Judge's determination that Mr. Mikhail's conduct—as alleged—might reasonably support a finding of malice, actual or implied, on which an assessment of punitive damages may be based. *See Morris v. Resolution Trust Corp.*, 622 A.2d 708, 712 (Me.1993). Were a jury to believe the Darlings, it might conclude that Mr. Mikhail's advice to them was disingenuous and motivated by a desire to improve his own position at their expense. Further, it might conclude that, taken in conjunction with his intentional misrepresentations, his denigration of their understanding of the loan documents was so outrageous as to support a finding of implied malice sufficient for an assessment of punitive damages. On this record, an award of summary judgment to Western is inappropriate.

## III. CONCLUSION

The Court concurs with the recommendations of the Magistrate Judge for the reasons set forth in her recommended decision and for the reasons set forth herein, and it determines that no further proceeding is necessary.

It is therefore ORDERED that the recommended decision of the Magistrate Judge (Docket # 61) is hereby AFFIRMED. It is further ORDERED that Defendant Western Thrift & Loan's Motion for Summary Judgment or, in the Alternative, Motion for Partial Summary Judgment/Summary Adjudication (Docket # 45) is hereby GRANTED IN PART and DENIED IN PART: Defendant Western is GRANTED summary judgment on Plaintiffs' First Cause of Action in Plaintiffs' Second Amended Complaint (Docket # 32). Defendant Western is DENIED summary judgment on the remaining Causes of Action in Plaintiffs' Second Amended Complaint. It is further ORDERED that Defendant's request for oral argument (Docket # 62) is DENIED.

SO ORDERED.

## RECOMMENDED DECISION

MARGARET J. KRAVCHUK, United States Magistrate Judge.

Joseph and Roxanne Darling are suing Western Thrift & Loan[1], a mortgage broker, under the federal Truth in Lending Act, 15 U.S.C. § 1601 (TILA) and Regulation Z, 12 C.F.R. § 266, alleging that Western Thrift failed to provide the proper required written disclosures to them prior to the closing of the Darlings' mortgage with the lender, IndyMac Bank, and misrepresented the terms of the loan to induce a closing. In addition to their TILA claim, the Darlings allege a violation of Maine's Unfair and Deceptive Trade Practice Act, breach of fiduciary duty, fraud, negligent misrepresentation, and "malice." Western Thrift has filed a motion for summary judgment or, in the alternative, for partial summary judgment. I recommend that the Court grant the motion only as to the TILA claim asserted in count I, and retain supplemental juris-

---

1. Paul Mikhail, the mortgage broker agent employed by Western Thrift, and IndyMac Bank F.S.B. are no longer party defendants to this action. According to paragraph four of the second amended complaint, Western Thrift has agreed that it is legally responsible for any actions/omissions on the part of Mikhail, if any are found to exist, but Western Thrift denies the truth of that allegation in paragraph four of its answer. Neither the summary judgment record nor the memoranda address this issue.

diction over the remaining state law claims.

## FACTS

The following facts are material to the motion for summary judgment. The facts are drawn from the parties' statements of material facts filed in accordance with Local Rule 56. *See Doe v. Solvay Pharms., Inc.*, 350 F.Supp.2d 257, 259–60 (D.Me. 2004) (outlining the mandatory procedure for establishing factual predicates needed to support or overcome a summary judgment motion); *Toomey v. Unum Life Ins. Co.*, 324 F.Supp.2d 220, 221 n. 1 (D.Me. 2004) (explaining "the spirit and purpose" of Local Rule 56). Factual disputes have been resolved in favor of the non-movants, the Darlings, and the recitation of a "fact" herein does not mean that it is undisputed by Western Thrift.

During the early part of 2005 Joseph and Roxanne Darling became interested in exploring various financial opportunities, including the possibility of refinancing their primary residence in West Gardiner, Maine, which they had built approximately three years earlier. Joseph Darling has no formal education past high school. Roxanne Darling attended college briefly, but never obtained any post-high school degree. (Non–Movants' Statement (NMS) ¶ 73, Doc. No. 52.)[2] Joseph Darling had some knowledge about adjustable rate mortgages and "stuff like that." (*Id.* ¶ 67.) Joseph Darling knew that the stock market and interest rates were "uneasy" at

the time. (*Id.* ¶ 68.) Joseph Darling educated himself about banks, lending, interest rates, and refinancing. (Movant's Statement (MS) ¶ 69, Doc. No. 46.)

In approximately January of 2005, the Darlings were introduced to Paul Mikhail through a third-party, Albert Myer, who belonged to what the Darlings believed to be an educational program[3] called "Pinnacle Quest." (NMS ¶ 74.) Myer advised that a variety of mortgage and other financial products were available that were far more favorable than generally existed in the marketplace, if you knew where to find them. Myer advised that a fellow named Paul Mikhail was "doing wonders" with a one-percent mortgage and recommended that they contact Mikhail. (*Id.* ¶ 75.) The Darlings were interested in the one-percent loan program because they wanted to pay off their home more quickly than under their existing loan, take money out of their house to refinish their daylight basement, and become members of Pinnacle Quest. (*Id.* ¶ 76.)

In February of 2005, Joseph and Roxanne Darling contacted Western Thrift & Loan and Paul Mikhail to inquire about a mortgage loan. (MS ¶ 1.) Neither Western nor Mikhail unilaterally approached the Darlings regarding this loan. In fact, it was only after the Darlings were told about Mikhail by Al Myer that they began conversing with Western and Mikhail about loan options. (*Id.* ¶ 57.) Mikhail spent a number of hours with the Darlings

---

**2.** Plaintiffs began their additional statement of material facts at consecutive paragraph number 73, following the defendants' first 72 paragraphs. However, defendants also filed a supplemental paragraph 73 (See Doc. No. 49.) For the sake of clarity I have retained plaintiffs' numbering system. Defendants request the first sentence of paragraph 73 be stricken. The sentence reads "Plaintiffs are unsophisticated in financial matters." Although I disagree with defendants that it should be stricken because it contradicts prior

deposition testimony, I am nevertheless not including it because it is a conclusory statement. The facts will speak for themselves.

**3.** Although neither party exactly spells this out in their statements of material facts, Pinnacle Quest appears to have been an entity that held seminars at exotic locations promising educational materials about the latest "good investment opportunities" and other current topics.

on the telephone discussing loan options and described them as "great clients." (*Id.* ¶ 58.) Mikhail never met the Darlings in person until approximately a year after the loan closed. (*Id.* ¶ 59.)

Mikhail initially reviewed the Darlings' credit score to ascertain whether they would qualify for the one-percent loan program. (NMS ¶ 77.) Mikhail called the Darlings back and advised them that: (a) they qualified for the one-percent loan program; (b) the one-percent loan would remain fixed for one year and then would likely adjust no more than "one tenth of a percent" per year; (c) the Darlings could take $75,000 cash out of the contemplated refinance transaction and pay off their loan at $800 a month in 10 to 12 years according to his calculations. (*Id.* ¶ 78.) At the time the Darlings entered into their loan transaction, they were "scrambling for the lowest interest rate" and hoped to use a portion of the $75,000.00 in loan proceeds to purchase their Pinnacle Quest membership and the remainder to complete some renovations to their home. They were looking for the lowest interest rate to shorten the term of their loan and to keep their monthly payments in the $800.00 range. (MS ¶ 7; NMS ¶ 7.) Ultimately, the Darlings used at least $24,000 of the cash they received from their loan with IndyMac Bank to pay for their membership in Pinnacle Quest, something they could not have afforded had they not refinanced their home and received cash out of the transaction. (MS ¶ 6). The Darlings could not have done a regular refinance in 2005 for the amount of money they borrowed. (MS ¶ 8.)

■ On March 3, 2005, Mikhail conveyed to the Darlings a "preliminary" TILA Disclosure Notice for the one-percent loan which he represented that he was obtaining for them. The Darlings understood the disclosure statement was preliminary and would change if they decided to obtain more money at the closing. (NMS ¶ 79; Movant's Reply Statement ¶ 79, Doc. No. 60.) The one-percent loan represented by the March 3, 2005, TILA Disclosure Notice [Exhibit 18] [4] was the loan that the Darlings proceeded to believe was the loan Mikhail was obtaining for them. (NMS ¶ 80.) The one-percent loan "disclosed" in the notice was not a form of loan that was then being offered by any lenders. (*Id.* ¶ 81.) Although the Darlings recognized that the March 3, 2005, TILA Disclosure Notice [Exhibit 18] was "preliminary"—and would change if the amount of money borrowed changed—they were advised by Mikhail and understood that they could "rely" on that notice as the final loan would look "pretty much" like the one disclosed in the March 3, 2005, notice. (*Id.* ¶ 83.) [5] The "one-percent loan" represented by Exhibit 18 called for 359 payments of $643.28 per month and a final payment (in the 360th month) of $642.89. (*Id.* ¶ 84.) The Darlings were enthusiastic about the one-percent loan represented by Exhibit 18. (*Id.* ¶ 85.)

Over the next several months, Mikhail kept reinforcing to the Darlings that the one-percent loan would work as detailed in Exhibit 18. Mikhail reiterated that in his experience the loan would rise no more than one-tenth of one percent per year and that the Darlings "would never even see

**4.** See Doc. No. 47–3 at 71.

**5.** Western Thrift objects to the inclusion of what Mikhail may have told the Darlings, citing the parol evidence rule. Reliance upon the parol evidence rule is misplaced. This evidence is not offered to alter or supplement the terms of the actual contract entered into between the Darlings and IndyMac. The statements by Mikhail are offered based upon the theory that he misrepresented what the ultimate contract would look like. The objection is overruled.

that difference" because of the extra $200 that he was recommending that they pay per month, an amount that would allow the loan to be paid off in much less than 30 years. (*Id.* ¶ 86.) Every time the Darlings questioned the loan, especially their perception that the terms seemed "too good to be true," Mikhail would "start from the beginning" and restate all of his explanations that the loan would operate essentially as detailed in Exhibit 18. (*Id.* ¶ 87.) Mikhail only discussed the one loan option with the Darlings and that was the so-called "one percent loan." (NMS ¶ 46.)[6]

Mikhail never represented to the Darlings that this loan would remain at one percent permanently. (MS ¶ 48.) The Darlings clearly understood that they would not have a one percent interest rate for the life of their loan. (*Id.* ¶ 49.) Mikhail maintains he never represented that the interest rate of their loan would not change in the first year of the loan, only that the payment amount would not change during the first year. (*Id.* ¶ 50.) Consistent with Mikhail's alleged representation, the minimum payment on the mortgage with IndyMac Bank remained at approximately $856.00 for at least the first year of the loan. (*Id.* ¶ 51.)

On February 9, 2005, the Darlings signed a residential loan application prepared by Mikhail using information provided to him by the Darlings. That information included income verification. (*Id.* ¶ 88.) Prior to obtaining the final loan, the Darlings signed a Mortgage Loan Origination Agreement with Western Thrift setting forth the nature of the relationship and the compensation terms on March 3, 2005. (*Id.* ¶¶ 73, 89.) The terms of the Loan Origination Agreement appeared to deviate from earlier representations made by Mikhail. The fact that the Loan Origi-

nation Agreement appeared to contain very different terms from Mikhail's representations initially alarmed the Darlings. (*Id.* ¶ 90.) However, specifically with regard to the Loan Origination Agreement, Mikhail told the Darlings that the Agreement was "just a total legal document" and "just legal stuff", and that they should simply sign the document. (*Id.* ¶ 91.) Mikhail's response to inquiries about the Loan Origination Agreement was the same as his response to any discrepancies with any of the documents throughout the course of this relationship. The paperwork was "just legal stuff" and the Darlings should simply sign the paperwork and "trust [him]." (*Id.* ¶ 92.) After the Darlings signed the disclosure on March 3, 2005, they decided to borrow more money than the $200,000 listed on the disclosure. (MS ¶ 40.) The Darlings ultimately secured a loan from IndyMac Bank in the principal amount of $266,250. (*Id.* ¶ 4.)

As discussed, before the closing documents were prepared, Mikhail had provided some "preliminary documents" to give the Darlings an "idea" of what the loan would look like, including Exhibit 18. This exhibit was not part of the final loan package as the amount financed listed in the exhibit is $200,000, which clearly indicates that there is no cash out component incorporated in the preliminary disclosure. Roxanne Darling understood the difference between preliminary documents and final documents, and that there were preliminary documents that needed to be signed, but that the final set of loan documents would serve as the actual disclosures. (MS ¶¶ 37–39.) However, Mikhail advised them they could rely on that notice and that the final loan would look "pretty much" like the March 3, 2005, disclosure. (NMS ¶ 39.)

---

**6.** Western Thrift disputes Roxanne Darling's testimony that only one loan was discussed.

Mikhail says he discussed various loans with the Darlings.

The closing occurred on May 12, 2005, at Yankee Title (in Gardiner, Maine). (NMS ¶ 93.) No one was present at the closing other than the Darlings and a representative of Yankee Title. (*Id.* ¶ 94.) At the closing, the Darlings signed a number of documents including an adjustable rate note. (*Id.* ¶ 95.) The closing documents, prepared and provided by the lender, IndyMac Bank, contained all of the proper disclosures, including a truth in lending disclosure, which detailed the loan terms and payoff schedule. (*Id.* ¶ 66.) The Darlings had never heard of the lender, Indy-Mac bank, until the closing. All of their dealings to the point of closing had been with Mikhail. (*Id.* ¶ 101.) The documents presented at the closing appeared to describe a very different loan from the one percent loan described by Mikhail that the Darlings expected to see. (*Id.* ¶ 96.) Roxanne Darling became extremely skeptical when confronted with the closing documents and called Mikhail during the closing, seeking clarification respecting the deviations. (*Id.* ¶ 98.) Mikhail confirmed that the paperwork detailed a "one percent loan" as he had described it throughout the prior months and as reflected in Exhibit 18, and that the Darlings "did not understand loan paperwork," which satisfied the Darlings. (*Id.* ¶ 99.) Based on Mr. Mikhail's representations that the loan was actually a "one percent loan" as they had previously discussed, the Darlings signed the paperwork and closed on their loan. In their words, "Paul [Mikhail] said to sign it, we signed it." (*Id.* ¶ 100.)

The Darlings never really understood the role of Mikhail in the transaction other than that he would be attempting to obtain the "best bank that would help [them] with [their] loan." (*Id.* ¶ 102.) The Darlings thought that Mikhail worked for IndyMac Bank and would be paid for his work ultimately by Pinnacle Quest. (*Id.* ¶ 103.) Western and Mikhail did not receive any money directly from the Darlings with re-spect to this loan transaction. (MS ¶ 18.) Any money received by Western or Mikhail with respect to the Darlings' loan transaction was disclosed to the Darlings by IndyMac Bank in the paperwork presented at the closing. Joseph Darling recalled that the loan paperwork did disclose some type of broker compensation. (*Id.* ¶¶ 20–21.) The Darlings did not understand the paperwork providing those disclosures. They maintain that Mikhail told them his fees were paid by Pinnacle Quest. (NMS ¶¶ 20–21.)

Mikhail made no representations to Joseph Darling personally, and Mr. Darling's understanding of all alleged representations by Mikhail came from what Roxanne Darling told him. (MS ¶ 22.) Joseph Darling was present during Roxanne Darling's deposition testimony and does not believe any of her testimony was inaccurate. (*Id.* ¶ 23.) The length of the mortgage payoff period "didn't matter" to Joseph Darling as he knew he could refinance after one year. (*Id.* ¶¶ 53, 64.) Joseph Darling admits he "dropped the ball" by not reading the closing documents. (*Id.* ¶ 55.)

Roxanne Darling understood that she and her husband were, by signing the closing documents, obtaining an adjustable rate mortgage, and that the mortgage would not stay at one percent for the life of the loan. (*Id.* ¶ 24.) Roxanne Darling understood that when she signed the Adjustable Rate Rider, that the document indicated that the interest rate could change as early as July 1, 2005. (*Id.* ¶ 25.) Roxanne Darling also understood as of the date of the closing that the language of the form meant that the interest rate could change *substantially* over the life of the loan. (*Id.* ¶ 26; Roxanne Darling Dep. at 79:3–80:17.) However, Roxanne Darling also testified that Mikhail repeatedly assured her that, based on his years of experience in the industry, he had never seen

the interest rate go up more than one-tenth of a percentage point per year. (NMS ¶¶ 26–27; Roxanne Darling Dep. at 36:1–38:24.)

The closing documents that the Darlings signed provided that their loan was for the amount of $266,250, and must be paid in full by June 1, 2035. (*Id.* ¶ 33.) The closing documents also contained provisions that would change the interest rate and monthly payment and provided that the interest rate may change on the first day of July 2005 and on the first day of every month thereafter. (*Id.* ¶ 34.) The closing documents provided for a broker compensation fee of $6,909.06 and a broker processing fee of $350 to be paid to Western. (*Id.* ¶ 35.) These documents also revealed that the loan allowed for negative amortization. (*Id.* ¶ 37.)

The day after the closing, the Darlings received a call from Yankee Title and were told to return to sign "new documents." (*Id.* ¶ 104.) The new documents consisted of a revised TILA disclosure statement and a revised good faith estimate. It is not uncommon to sign prior disclosures at closing or even after the closing. (*Id.* ¶ 105; Movant's Reply ¶ 105.) The documents, including the Truth in Lending Disclosure form signed the day after closing, were prepared February 4, 2005, more than three months prior to closing. (MS ¶ 42.) The Truth in Lending Disclosure allegedly signed by the Darlings on May 13, 2005, clearly states on its face that it "is neither a contract nor a commitment to lend." (*Id.* ¶ 43.) It is common practice within the lending industry to sign prior disclosures at closing, or even after clos-ing, in order to ensure that the loan package is complete. (*Id.* ¶ 44.) Once again, Roxanne Darling questioned these documents and called Paul Mikhail for an explanation. (NMS ¶ 106.) Once again, Mikhail stated that the new documents were just "legal stuff" and, again, reaffirmed that the loan was a one percent loan like he had described since February. (*Id.* ¶ 107.)

In June of 2005, the Darlings received their first monthly statement from Indy-Mac Bank. (*Id.* ¶ 108.) Mikhail had told the Darlings to "disregard" the IndyMac monthly statement. (*Id.* ¶ 109.)[7] Approximately three months after closing, in August of 2005, the Darlings learned that their loan was "growing" (or "negatively amortizing") and called IndyMac Bank. (*Id.* ¶ 111.) In August 2005, Mikhail refused to return or answer the Darlings' repeated telephone calls respecting the negative amortization of their loan. (*Id.* ¶ 112.) Almost immediately after the Darlings placed their first call to IndyMac Bank regarding their discontent with this loan transaction, IndyMac offered to put them in contact with a loan officer to see if they could help. However, the Darlings refused this offer, informing IndyMac that they were "looking at different avenues." (MS ¶ 61.) Western offered to remit a check to the Darlings in the amount of $6,989.06, the amount of compensation paid to Western by IndyMac Bank for broker services, even though the Darlings never directly paid Western or Mikhail broker fees. (*Id.* ¶ 62.)

---

7. Western Thrift objects to this statement which is supported by Roxanne Darling's affidavit because they say the affidavit "clearly contradicts [her] prior deposition testimony." It makes this same objection to any number of material facts supported by the affidavit. I did not find any of the testimony to be in clear contradiction of deposition testimony, except for plaintiffs' paragraph 110 of their additional statement of material fact, which I have excluded from this statement of facts. There are other slight variations between the deposition and the affidavit that would go to credibility. I have consistently overruled this objection throughout this statement of material facts, with the one exception noted.

On approximately August 30, 2005, the Darlings submitted a complaint to the Maine State Office of Consumer Credit regulation, asserting complaints against Western/Mikhail respecting their mortgage loan. (NMS ¶ 113.) It was not until almost one year after closing, in April of 2006, that the Darlings attempted to exercise their three-day right of rescission. (MS ¶ 12.) The Darlings now wish to rescind the entire loan transaction, to keep their property and $75,000 free and clear, with no obligation whatsoever. (*Id.* ¶ 14.) More than two and a half years after signing their closing paperwork, the Darlings had not even looked into refinancing their mortgage in an attempt to secure different loan terms than those they agreed upon when they signed their contract with IndyMac Bank. (*Id.* ¶ 63.) The Darlings filed their initial complaint on October 3, 2006. (*Id.* ¶ 17.)

Western Thrift does not regularly extend consumer credit—in that it acts as a mortgage broker in these transactions—and was not the person to whom the Darlings' debt was initially payable. Western does not lend any money in such transactions but solely acts as a broker and refers the transaction to a third party wholesale lender such as IndyMac Bank. (*Id.* ¶ 15.) The Darlings understood that Western and Mikhail were not loaning them money, and that it was IndyMac Bank that was the bank providing the funds. (*Id.* ¶ 16; NMS ¶ 16.) This transaction was solely funded by IndyMac Bank and it is IndyMac to whom the mortgage debt is owed. (MS ¶ 72.)

The Darlings have suffered between $30,000 and $50,000 in damages as a result of the negative amortization of their mortgage debt and will likely suffer future damages as well. (NMS ¶ 56.) The Darlings have not attempted to refinance because this lawsuit is pending. (MS ¶ 70.) As of September 17, 2007, the Darlings were current on their mortgage payments to IndyMac Bank. (NMS ¶ 71.)

## DISCUSSION

The Darlings' amended complaint recites six causes of action:

(1) A claim under the Truth in Lending Act for improper disclosures in connection with the extension of credit;

(2) A claim under Maine's Unfair and Deceptive Trade Practices Act;

(3) A claim alleging breach of fiduciary duties;

(4) A claim of fraud;

(5) A claim of negligent misrepresentation; and

(6) A claim of "malice."

(Second Am. Compl., Doc. No. 32.) Western's motion for summary judgment requests an order disposing of every cause of action.

### 1. The Truth in Lending Act claim is time barred.

The Truth in Lending Act (TILA), 15 U.S.C. §§ 1601–1667f, is a subchapter within the Consumer Credit Protection Act. In general, the TILA requires creditors to make certain disclosures to borrowers in connection with the provision of credit. *Sullivan v. Greenwood Credit Union,* 520 F.3d 70, 73 (1st Cir.2008). The TILA subjects creditors to civil liability should they fail to make the required disclosures. *Id.* at 74. The disclosure requirements of the TILA are informed by Regulation Z, authored by the Federal Reserve Board. *Santos–Rodriguez v. Doral Mortgage Corp.,* 485 F.3d 12, 14 (1st Cir.2007).

Western Thrift argues that there can be no TILA cause of action against it because it served as a broker in this credit transaction and a broker is not a creditor subject to the TILA's disclosure mandates.

(Mot. for Summ. J. at 7–9, Doc. No. 45.) Western Thrift additionally argues that the cause of action cannot be maintained because it is barred by the TILA's one year limitation period. (*Id.* at 9–10.) The claim is clearly time barred, so judgment should enter for Defendant Western Thrift on count I regardless of whether Western Thrift is a "creditor" subject to the TILA's disclosure requirements.

The TILA's limitation provision states that "[a]ny action under this section may be brought in any United States district court, or in any other court of competent jurisdiction, within one year from the date of the occurrence of the violation." 15 U.S.C. § 1640(e). The limitation period commences on the date "the borrower discovers or had reasonable opportunity to discover the fraud involving the complained of TILA violation." *Jones v. TransOhio Sav. Ass'n,* 747 F.2d 1037, 1043 (6th Cir.1984). Equitable tolling is available. *Id.; Ramadan v. Chase Manhattan Corp.,* 156 F.3d 499, 504 (3d Cir. 1998); *Ellis v. GMAC,* 160 F.3d 703, 706 (11th Cir.1998) (collecting cases agreeing that the TILA limitation provision is subject to equitable tolling). "The doctrine of equitable tolling suspends the running of the statute of limitations if a plaintiff, in the exercise of reasonable diligence, could not have discovered information essential to the suit." *Gonzalez v. United States,* 284 F.3d 281, 291 (1st Cir.2002).

The Darlings closed on the IndyMac loan on May 12, 2005, and commenced this civil action on October 3, 2006, just over 16 months later. The facts reflect that the Darlings understood as of August 2005 that their loan was negatively amortizing and that they contacted IndyMac to express their concern at that time. By August 30, 2005, they had submitted a complaint to the Maine State Office of Consumer Credit regulation. On this record, there can be no legitimate dispute but that the Darlings had discovered the alleged fraud as of August 30, 2005, or sooner. Their TILA cause of action is time barred even if the Court assumes that Western, as a broker, is a creditor subject to the TILA's disclosure requirements.[8]

**2. Genuine issues of material fact exist on all of the supplemental state law claims.**

The factual core of this case is that the Darlings allegedly relied on false representations made by a mortgage broker whose services they sought in order to obtain a mythical one percent loan with a rate that would not likely grow more than one-tenth of a percentage point annually. On one version of the facts, the broker, Western Thrift's agent, assured the Darlings that they were worthy applicants for such a loan and that he could obtain such a loan for them from a bank. The Darlings placed their trust in the broker, agreed to apply for such a loan, did so based on his assurances that such a loan was in fact available, and relied on him to procure the loan for them. Thereafter, when a loan package was presented to them that did not appear to conform to the broker's representations, the Darlings balked, but upon placing a call to the broker, went through with the deal based on his representation that it was in fact the one percent loan they had talked about and that they simply did not understand the loan paperwork.

On this record, the Darlings have all of the evidence necessary to generate a genuine factual dispute on all the elements

8. *See* 15 U.S.C. § 1602(f); *see also* Regulation Z definition of creditor, 12 C.F.R. § 226.2(a)(17).

of their varied state law tort claims, with the possible exception of justifiable reliance. The fraud and negligent misrepresentation claims largely overlap, though the former requires proof by clear and convincing evidence. Fraud requires a showing (1) that the other party made a false representation (2) of a material fact (3) with knowledge of its falsity or in reckless disregard of whether it is true or false (4) for the purpose of inducing him to act in reliance upon it, and (5) he justifiably relied upon the representation as true and acted upon it to his damage. *Guiggey v. Bombardier*, 615 A.2d 1169, 1173 (Me. 1992). Negligent misrepresentation requires a showing that the other party, in the course of his business, supplied false information for the guidance of the plaintiffs in their business transactions, and that the plaintiffs justifiably relied upon that information to their pecuniary harm. *Id.*

The record presents a genuine question whether the broker supplied the Darlings with information he knew to be false concerning the terms of the loan he secured for the Darlings, for the purpose of inducing their reliance, which resulted in economic harm when the terms were not as good as represented. That evidence satisfies the requirements of both misrepresentation torts. Additionally, in this commercial context it would also be sufficient to demonstrate an "unfair or deceptive" commercial practice for purposes of Maine's Unfair Trade Practices Act (UTPA), 5 M.R.S. § 207. "Whether a trade practice is unfair or deceptive is a question of fact determined by the fact-finder." *State v. Weinschenk*, 2005 ME 28, ¶ 15, 868 A.2d 200, 206. "An act or practice is deceptive if it is a material representation, omission, act or practice that is likely to mislead consumers acting reasonably under the circumstances." *Id.*, ¶ 17, 868 A.2d at 206. The provision of false information about the terms of a loan is likely to be regarded

by a fact finder as material and likely to mislead consumers to their financial detriment, assuming that reliance is justified. That leaves the fiduciary duty claim and the so-called "malice" claim.

. "The question of whether one party owes a fiduciary or other duty of due care to another is a question of law." *Fortin v. Roman Catholic Bishop of Portland*, 2005 ME 57, ¶ 35, 871 A.2d 1208, 1220. What is needed to demonstrate the required relationship is evidence that one party placed its trust and confidence in the other and that there was a great disparity of position and influence favoring the one in whom the trust was placed. *Camden Nat'l Bank v. Crest Constr., Inc.*, 2008 ME 113, ¶ 13, 952 A.2d 213, 217. The Law Court has held that the mere existence of a creditor-debtor relationship or a mortgagor-mortgagee relationship will not establish the existence of a confidential or fiduciary relationship. *Id.*, 2008 ME 113, ¶ 15, 952 A.2d at 217; *Stewart v. Machias Sav. Bank*, 2000 ME 207, ¶ 11, 762 A.2d 44, 46. By extension, it seems plain that the relationship of a mortgage broker to a consumer is not inherently a fiduciary or confidential relationship. What is required is additional evidence related to the actual placement of trust in another that creates a disparity of position or influence.

The Law Court has characterized great disparity of position or influence as the kind of disparity that arises from "diminished emotional or physical capacity or . . . the letting down of all guards and bars"; the mere "allegation of one party's inexperience and trust" is insufficient absent evidence "indicating the actual placing of confidence and trust, and the abuse of the relation." *Stewart*, 2000 ME 207, ¶ 11, 762 A.2d at 46. The mere fact that the Darlings assert their relative inexperience and lack of sophistication is, therefore, not sufficient to support their breach of fiduciary

duty claim. However, they have also presented a record that is capable of supporting a finding that they placed their trust in the broker based on his assurances that they should do so. This is evidence of the actual placement of confidence and trust in another. That trust could support a finding that they let down "all guards and bars" precisely because it appears that they placed their trust in the broker despite their own skepticism that the loan presented to them would correspond with the broker's alleged assurances. This trust could therefore be regarded as giving the broker a great disparity of position or influence over the Darlings' decision. Someone with years of experience in the business of procuring mortgage loans from lenders who has represented to a consumer that he will secure a loan with certain terms or certain likely financial consequences is in a special position of knowledge in relation to whether or not the loan actually procured measures up to his assurances.

In *Morris v. Resolution Trust Corp.*, the Law Court affirmed a plaintiff's verdict in a fiduciary duty action supported by evidence that the plaintiff borrower had placed her trust in and relied on representations made by the defendant bank's loan officer, who reassured her that her contractor (a bank customer with delinquent accounts) was reliable and good and that she should stick with him on a renovation project financed by the bank. 622 A.2d 708, 711–712. The Law Court observed that the claim was not defeated simply because there was no "evidence … that [the plaintiff] was completely incapable of acting to protect her own interests." *Id.* at 712. The salient factors in *Morris* were that the plaintiff expressed her concern and doubt about continuing her relationship with the contractor, but placed her trust in and relied to her detriment on representations made by the loan officer who professed superior knowledge based on his own course of dealings. *Id.* There is a genuine question whether those circumstances exist here. The Darlings relied on the broker, expressed doubt in continuing when they saw the terms of the loan he delivered, but placed their trust in his reassurances that they simply did not understand loan paperwork as he did, based on his superior knowledge of the same. This placement of trust, allegedly based on the broker's reassurances and promises, generates the potential factual finding needed to support the imposition of a fiduciary duty as a matter of law.

Underlying all of these claims is the very troublesome question of whether the Darlings justifiably relied on the alleged representations made by the broker. This concern arises precisely because the Darlings were provided at the closing with proper disclosures and with loan documents that belied the existence of the "one percent loan" that the Darlings maintain they were promised. Additionally, Western Thrift emphasizes that the Darlings had a few days in which to review the documents and lawfully rescind the loan, had they exercised sufficient diligence. (Mot. for Summ. J. at 11–12.) As for diligence, the record reflects that Ms. Darling did understand as of the closing date that the language on the loan documents warned of the possibility of a significant fluctuation in the applicable interest rate over the life of the loan, and that the rate would be recalculated sometime between the Darlings' first and second payments. In addition to highlighting these facts Western Thrift attempts to buttress its argument for summary judgment by invoking the parol evidence rule, arguing that it is entitled to judgment on the question as a matter of law. (*Id.* at 12–13.)

Before addressing the evidence as it pertains to reliance, it is plain from Law Court precedent that the parol evidence

rule does not impact the dispute between the Darlings and Western Thrift. The parol evidence rule does not apply here because the Darlings are not trying to prove that the IndyMac mortgage is not binding as written or that there was some preexisting agreement with IndyMac that modifies the terms of the mortgage they entered into. *See Nelson v. Leo's Auto Sales, Inc.,* 158 Me. 368, 370, 185 A.2d 121 (Me.1962) ("The nature of the action allows the plaintiff to introduce testimony *aliunde,* not for the purpose of altering the written contracts but rather to evidence the fact, as she says, a false and fraudulent representation [was] made for the purpose of inducing her to execute them.").

As for the element of justifiable reliance, it presents an issue of fact. *Devine v. Roche Biomed. Labs., Inc.,* 637 A.2d 441, 446 (Me.1994). In this case the Court must weigh the Darlings' understanding that the language of their actual mortgage loan was inconsistent with the alleged representations of the broker against the alleged assurances by the broker that the interest rate would not likely increase from one percent by more than one-tenth of a percentage point monthly. In effect, the Court is being called upon to decide whether consumers whose antennae are attuned to the fact that an offer sounds too good to be true should be precluded from suing when their suspicions are confirmed, even if it effectively insulates a mortgage broker from liability for (on one version of the facts) patently false representations about the way the so-called one percent loan (as in a loan having a one-month introductory rate and a monthly payment schedule resulting in negative amortiza-

tion) will play out over time. My conclusion is that that decision ought to be made by the jury because a contrary ruling would effectively insulate mortgage brokers from liability for sharp practices.

▮ Finally, there is a claim of "malice." This is really a plea for punitive damages, which are available, generally speaking, when the evidence supports a finding that tortious conduct was motivated by actual or implied malice. *Morris,* 622 A.2d at 712 (citing *Tuttle v. Raymond,* 494 A.2d 1353, 1361 (Me.1985)). In *Morris,* discussed above, the Law Court affirmed an award of punitive damages based on evidence that the loan officer's advice was misleading and motivated by a desire to realize a financial gain at the plaintiff's expense, holding that "[t]his behavior may reasonably be considered outrageous, and thus supports a finding of implied malice sufficient for an assessment of punitive damages." *Id.* at 713. The same might be found with respect to the present record.[9]

### 3. The Court has broad discretion whether to exercise supplemental jurisdiction over the remaining claims.

Pursuant to 28 U.S.C. § 1367(a):

[I]n any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

---

9. Western Thrift also argues that there are no damages in this case and that the Darlings have failed to mitigate damages by attempting to refinance. (Mot. for Summ. J. at 23–24, citing Pl.'s Statement ¶¶ 60–63.) The argument that no damages exist relies on a false characterization of the record. (See Roxanne Darling Dep. at 182:7–182:24.) Western Thrift is correct that there may well be a significant failure to mitigate damages here but Western Thrift does not adequately explain why that fact would entitle it to judgment as a matter of law.

According to the Supreme Court, section 1367's grant of authority over supplemental claims between parties who are already properly in federal court "should be read broadly, on the assumption that in this context Congress intended to authorize courts to exercise their full Article III power to dispose of an 'entire action before the court [that] comprises but one constitutional case.'" *Exxon Mobil Corp. v. Allapattah Servs., Inc.,* 545 U.S. 546, 125 S.Ct. 2611, 2617, 162 L.Ed.2d 502 (2005) (quoting *Finley v. United States,* 490 U.S. 545, 549, 109 S.Ct. 2003, 104 L.Ed.2d 593 (1989)).

> Section 1367(a) is a broad grant of supplemental jurisdiction over other claims within the same case or controversy, as long as the action is one in which the district courts would have original jurisdiction. The last sentence of § 1367(a) makes it clear that the grant of supplemental jurisdiction extends to claims involving joinder or intervention of additional parties.

*Id.* at 2620.

The Court had original jurisdiction over this case at its inception based on the federal question presented by the TILA claims. Supplemental jurisdiction over the state law claims between the Darlings and Western Thrift, therefore, may be exercised notwithstanding the absence of evidence that the amount in controversy would permit original jurisdiction to be exercised based on the parties' diversity of citizenship. An exercise of supplemental jurisdiction is permissible "when the federal and nonfederal claims 'derive from a common nucleus of operative fact.'" *Finley,* 490 U.S. at 549, 109 S.Ct. 2003 (quoting *United Mine Workers v. Gibbs,* 383 U.S. 715, 725, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966)). Here, the claims pursued by the Darlings are related in such a fashion.

The "justification" for exercising supplemental jurisdiction "lies in consider-ations of judicial economy [and] convenience and fairness to litigants; if these are not present a federal court should hesitate to exercise jurisdiction over state claims." *Gibbs,* 383 U.S. at 726, 86 S.Ct. 1130. In the words of the statute:

> (c) The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if—
>
> (1) the claim raises a novel or complex issue of State law,
>
> (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,
>
> (3) the district court has dismissed all claims over which it has original jurisdiction, or
>
> (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c). The parties have not addressed whether or not the Court should continue to exercise supplemental jurisdiction over the state law claims, presumably because they would both prefer for the matter to be resolved in the context of the present action.

The Court has broad discretion over the decision to exercise supplemental jurisdiction. *Chungchi Che v. Mass Bay Transp. Auth.,* 342 F.3d 31, 37 (1st Cir. 2003). On this record the Court would presumably be affirmed however it decided the matter. Because it is most efficient for the court system and for the litigants if the Court brings this dispute to judgment in the context of the present civil action, I recommend that the Court retain supplemental jurisdiction over the action.

## Conclusion

For the reasons articulated in the foregoing discussion, I RECOMMEND that the Court GRANT, IN PART, Western

Thrift & Loan's motion for summary judgment (Doc. No. 45), by entering judgment in its favor on the TILA claim (count I), and otherwise deny the motion.

### NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, and request for oral argument before the district judge, if any is sought, within ten (10) days of being served with a copy thereof. A responsive memorandum and any request for oral argument before the district judge shall be filed within ten (10) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

August 12, 2008